UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
In re:

SILICON GRAPHICS, INC. et al.,	Ch.11 Case No. 06-10977 (BRL)

(Jointly Administered)

Debtors.
--------------------------------------------------------x

SILICON GRAPHICS, INC.,

Plaintiffs,

Adv. Pro. No. 06-1560

v.

MERRILL LYNCH TRUST CO. OF
CALIFORNIA, et al.,

Defendants.
--------------------------------------------------------x

MEMORANDUM DECISION GRANTING MOTION TO DISMISS ERISA
PREEMPTED CLAIM AND DENYING CROSS-MOTION TO AMEND

Before the Court is the motion (the "Motion") of Silicon Graphics, Inc. ("SGI") to strike an affirmative defense or alternatively, to dismiss a counterclaim asserted by defendant Robert Bishop ("Bishop"), pursuant to Rule 12 of the Federal Rules of Civil Procedure, made applicable here by Rule 7012(b) of the Federal Rules of Bankruptcy Procedure. Bishop, an intervening defendant, opposes the Motion and seeks to amend his answer to include new defenses. Bishop has filed a proof of claim which implicates the subject matter of this adversary proceeding but which is not before the Court at this juncture.

1

**BACKGROUND**

On May 8, 2006, Silicon Graphics and certain of its subsidiaries (collectively, the "Debtors"), filed voluntary petitions for relief under chapter 11 of title 11, United States Code (the "Bankruptcy Code"). On September 15, 2006, the Debtors filed their First Amended Plan of Reorganization, dated July 27, 2006. Under the terms of the Amended Plan of Reorganization, general unsecured creditors of SGI were projected to receive 26.5% of the amount of their claims and old equity interests were extinguished. On September 19, 2006, this Court entered an order confirming the Plan of Reorganization. On October 17, 2006, the Effective Date occurred and the Debtors emerged from chapter 11.

**The Compensation Plan**

On July 1, 1994, SGI established a deferred compensation program through a Non-Qualified Deferred Compensation Plan (the "Plan") for the benefit of certain management employees and members of the SGI board of directors, commonly known as a "top hat" plan. The Plan provided certain tax benefits to participants by deferring compensation so that the participants' tax liability for that compensation is also deferred until the payments are received, usually after retirement or termination of employment. To qualify for these tax benefits, however, participants do not have rights that attach to any specific funds and accordingly, the Plan provided that SGI would pay all of the accrued benefits from its general assets and that each participant would have the same rights as a general creditor of SGI. By providing that Plan participants have no greater legal rights than general creditors, SGI's employee participants did not constructively

receive income prior to an actual payment and thus could obtain the tax benefits associated with deferred compensation plans.

After establishing the Plan, SGI and Merrill Lynch Trust Co. of California ("Merrill Lynch") entered into a trust agreement (the "Trust Agreement"), under which SGI agreed to contribute assets to be held by Merrill Lynch in an irrevocable trust (the "Trust") in connection with the Plan. The Trust Agreement provides that the Trust is a grantor trust, of which SGI is the grantor. (Compl., at ¶ 8). The funds in the Trust remain the property of the SGI and thus, because the participants do not have any right to the Trust funds prior to an actual distribution, the tax benefits are retained. The assets held in trust pursuant to this Plan are the subject of the adversary proceeding commenced by SGI.

Prior to the bankruptcy filing, from August 23, 1999 through January 27, 2006, Robert Bishop was the Chairman and Chief Executive Officer of SGI.[1] When Bishop assumed the position of Chairman and CEO of SGI, he became eligible for participation in the Plan and deferred his compensation from January 2000 through December 2003. Under the Plan, Bishop was not permitted to receive his deferred compensation until two years from the commencement of his participation in the Plan. Bishop elected to receive his first payment in September 30, 2004. The Plan election form provided that no distributions would be made if SGI was insolvent. *See* Opposition by Defendant Robert Bishop, ¶ 7. Bishop alleges that this payment was partially made, but did not include three months of compensation. Soon after resigning as CEO, approximately one month

---

[1] Prior to that time, Bishop was an employee of Silicon Graphics World Trade Corp., a subsidiary of SGI.

before Debtors filed the chapter 11 petitions, Bishop sought to receive an "early distribution" of his deferred compensation.[2] The SGI board of directors voted to deny that request because of SGI's financial situation at that time. It is more than likely that the Debtors were well within the "zone of insolvency" at that point in time.[3] Although resigning as CEO, Bishop remained a member of SGI's board of directors until the Effective Date.

On June 26, 2006, Debtors filed the complaint against Merrill Lynch, pursuant to Section 542 of the Bankruptcy Code, to compel Merrill Lynch to turn over the assets of the Plan to the Debtors' bankruptcy estate. Pursuant to stipulations, Merrill Lynch, Bishop and Debtors agreed that Bishop would be permitted to intervene in the adversary proceeding and preserve his claim to the funds and that Merrill Lynch would turn over possession of the Trust's assets to Debtors to be held in escrow pending the outcome of the adversary proceeding.[4]

**The Answer**

Bishop filed his answer to the complaint alleging that SGI wrongfully withheld a portion of the distribution to which he was entitled in 2004, as well as the entirety of the distribution to which he was entitled in 2006. Bishop contends in his "affirmative

---

[2] Bishop had originally designated a later date for the 2006 payment but sought earlier payment upon his resignation.

[3] *See eg.,* Nancy A. Peterman, *Directors Duties in the Zone of Insolvency: the Quandry of the Nonprofit Corp.*, 23-2 ABIJ 12 (March 2004) (describing the zone of insolvency and the financial tests for determining if a corporation has entered it). The Local Rule 1007-2 affidavit filed by the Debtors on May 8, 2006 stated that as of December 2005, SGI's unaudited consolidated financial statements reflected assets totaling approximately $397 million and liabilities totaling approximately $650 million.(*See, In re Silicon Graphics, Inc.,* Case No. 06-10977 (brl) (ECF. Docket # 4).

[4] Apparently, the other employee-participants in the top-hat Plan merely filed unsecured claims against the Debtors' estates for the amounts due them under the Plan.

4

defense" that this Court should impose a constructive trust in his favor pursuant to the California Civil Code. Bishop seeks a judgment for more than $1 million in deferred compensation allegedly due to him in accordance with the Plan.

**DISCUSSION**[5]

**The Motion to Strike or Dismiss**

Although SGI moved to strike Bishop's affirmative defense, SGI argues that the defense should be treated as a counterclaim because the pleading seeks a judgment and thus should be considered under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Bishop has not contested the requested designation of his defense as a counterclaim.

Rule 8(c) of the Federal Rules of Civil Procedure, made applicable by Rule 7008(a) of the Bankruptcy Rules of Procedure, provides that "when a party has mistakenly designated a defense as a counterclaim or a counterclaim as a defense, the court on terms, if justice so requires, shall treat the pleading as if there had been a proper designation." Fed. R. Civ. P. 8(c).

The standard for a Rule 12(f) motion to strike "is the *mirror image* of the standard for considering whether to dismiss for failure to state a claim" under Rule 12(b)(6). *Canadian St. Regis Band of Mohawk Indians ex rel. Francis v. New York,* 278 F.Supp.2d 313, 332 (N.D.N.Y. 2003); *see also United States v. Portrait of Wally,* No. 99 Civ. 9940, 2002 WL 553532, at 4, n. 3 (S.D.N.Y. April 12, 2002) (citation omitted) (application of Rule 12(f) or Rule 12(b)(6) "is academic, as the standard is the same ⋯, and courts ⋯

---

[5] This is a core proceeding under 28 U.S.C. § 157(b)(2)(B), and the Court has jurisdiction under 28 U.S.C. § 1334(b).

used both to reach the same result"*); Doe v. Roman Catholic Diocese of Galveston-Houston,* 2006 WL 2413721, *2 (S.D.Tex. 2006) ("When a Rule 12(f) motion to strike challenges the sufficiency of an affirmative defense, the standards for a Rule 12(f) motion to strike and a Rule 12(b)(6) motion to dismiss are mirror images.")

In determining whether a party has pled an affirmative defense or asserted a counterclaim, courts look to whether the pleading seeks to obtain a judgment. *Hinfin Realty Corp. v. The Pittston Co.,* 206 F.R.D. 350, 354-55 (E.D.N.Y. 2002). Here, because Bishop's Answer explicitly "demands judgment" in the amount of $1 million, his "affirmative defense" can be treated as a counterclaim. *Id.* Accordingly, for purposes of this Motion and as set forth below, the pleading shall be considered as a counterclaim.

Pursuant to Rule 12(b)(6), the Court shall dismiss a complaint on the ground that it fails to state a claim upon which relief may be granted. Fed.R.Civ.P. 12(b)(6); Fed. R. Bankr.P. 7012(b). In reviewing a motion to dismiss, a court merely assesses the legal feasibility of the complaint, and does not weigh the evidence that may be offered at trial. *Global Network Communications, Inc. v. City of New York,* 458 F.3d 150, 155 (2d Cir. 2006). A motion to dismiss must be denied unless it, "appears beyond doubt that the plaintiff can prove no set of facts in support of its claim which would entitle it to relief." *Conley v. Gibson,* 355 U.S. 41, 47 (1957). All well-pled factual allegations must be read by the court as true and construed in a light most favorable to the non-moving party. *Id.* Although the Court is to take the well-pled allegations in the Complaint as true for a motion to dismiss, legal conclusions, deductions or opinions couched as factual

allegations are not given a presumption of truthfulness. *Mason v. American Tobacco Co.,* 346 F.3d 36, 39 (2d Cir.2003); *In re Spiegel, Inc.* 354 B.R. 51, 56 (Bankr. S.D.N.Y. 2006). When determining the sufficiency of a claim for Rule 12(b)(6) purposes, the court may consider documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in the opposing parties' possession or of which plaintiffs had knowledge and relied on in bringing suit. *See Brass v. American Film Technologies, Inc*., 987 F.2d 142, *150 (2d Cir.1993).

**Bishops "Procedurally Defective" Argument**

The basic issues are straightforward: SGI contends that the Plan is covered by the Employee Retirement Income Security Act (ERISA) and therefore Bishops' defenses or counterclaims under state law are pre-empted. Bishop, however, contends that the Plan is not covered by ERISA and that the constructive trust doctrine, or California Wage Law should be applied.

However, as a threshold matter Bishop urges that this Court procedurally decline to consider the Motion or strike in its entirety because of a "[b]latant" omission. This sought after legal stoplight, detour, and/or roadblock is based upon a hair splitting contretemps in an apparent effort to prevent this Court from deciding the issues as a matter of law. Bishop's counsel, without showing a scintilla of prejudice to Bishop, declares that because the document describing the motion is called "Notice of Motion" rather than the omitted more descriptive "Motion To Strike," it should be ignored or

stricken with negative adjudicative consequences to the Movant. Aside from the fact that no prejudice has been shown, the moving papers contain all of the procedural and factual information that would appear in a document labeled "Motion To Strike." *See* Local Rule 9013-1(a), (b). Furthermore, as part of the requested detour, counsel argues that because of an improper exhibit attachment, the SGI Plan and Trust document, should not be considered as part of the Motion. This, despite the Plan being the centerpiece of the Motion, before the Court as part of the Complaint in this proceeding and the basis for the related $1 million filed proof of claim. By urging serious consideration of a dubious threshold issue, an inordinate portion of the briefing and this Court's consideration has been expended. Illustrative of the analysis made necessary by the procedural excursion is the following *inter alia* extract from Movants Reply Brief with which this Court concurs:

> It is well settled that on a motion of this sort, courts may give consideration "to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiffs possession or of which plaintiffs had knowledge and relied upon in bringing suit." *Brass v American Film Technologies, Inc.* 987 F2d 142, 150 (1993). In addition when the issue is whether a plan is governed by ERISA and "the record contains the undisputed terms of the plan....a court may decide the applicability of ERISA as a matter of law." *Hahn v. Nat'l Westminster Bank, N.A.*, 99 F.Supp.2d 275, 277 (E.D.N.Y. 2000).
> Here the plan is incorporated by reference in the complaint. [*See* Plan, ¶¶ 6, 7] The Plan is also incorporated in the Trust Agreement, which was an exhibit to the complaint. *See* Complaint, Ex. A. In addition the Plan is repeatedly referenced and relied upon in Bishop's answer and his proposed Amended Answer. [*See* Answer ¶¶ 18 - 25].

There is no basis for this court to dismiss or strike the Motion.

**The Plan Is an ERISA Plan**

In 1974, Congress enacted ERISA, a comprehensive statutory scheme designed to govern health care and other benefits provided by employers to their employees. *See* 29 U.S.C.

8

1001, et seq. Pursuant to ERISA, the terms "employee pension benefit plan" is any plan, fund, or program which is established or maintained by an employer that:

> (i) provides retirement income to employees, or
>
> (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond, regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan.

29 U.S.C.A. § 1002

In addition, ERISA defines a "top hat" plan as: "a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1).

When a plan is "unfunded,"

> [t]he employer promises to pay the employee the deferred compensation at a specified time, but does not set aside the funds in an escrow, trust fund, or otherwise. The assets used to pay the deferred compensation are the general assets of the employer and are subject to the claims of the employer's creditors.

*See In re IT Group, Inc.,* 448 F.3d 661, 664 (3d Cir. 2006) (citing David J. Cartano, *Taxation of Compensation & Benefits*, § 20.02[A], at 721 (2004)(hereinafter 'Cartano").

The employee is not subject to tax on the compensation until he or she actually receives the deferred amount because "the employee may never receive the money if the company becomes insolvent." *Id.* An employer may set aside deferred compensation amounts in a segregated fund or trust without jeopardizing a plan's "unfunded" status if the fund or trust remains "subject to the claims of the employer's creditors in the event of insolvency or bankruptcy." *Id.* citing Cartano at § 20.05[D], at 731; *Gallione v. Flaherty,* 70 F.3d

9

724, 725 (2d Cir.1995); *Miller v. Heller,* 915 F. Supp. 651 (S.D.N.Y. 1996) (held that the question a court must ask in determining whether a plan is unfunded is: "can the beneficiary establish, through the plan documents, a legal right any greater than that of an unsecured creditor to a specific set of funds from which the employer is, under the terms of the plan, obligated to pay the deferred compensation?" )

Certain deferred compensation plans or "top hat" plans, are subject to ERISA's administrative and enforcement provisions, but exempt from the substantive provisions that regulate plan funding and impose fiduciary duties. *See In re IT Group, Inc*. 448 F.3d at 664 -665.[6] Congress exempted "top hat" plans from ERISA's substantive protections because it believed that, unlike other employees, management and highly compensated employees have sufficient bargaining power to negotiate favorable deferred compensation plans and are capable of taking the risks attendant to such plans into account. *Id. citing* Dep't of Labor, Pension & Welfare Benefit Programs, Op. Ltr. 90-14A, 1990 ERISA LEXIS 12, at 3-4 (May 8, 1990).

On its face, the SGI Plan is an "employee pension benefit plan." The Plan provides that it is "a supplemental retirement plan for the benefit of a select group of management or highly compensated employees of the Company…" *See* Plan at l, ¶ 1. The Plan also provides that, unless another option is agreed upon with an individual employee, "no

---

[6] Top hat plans are exempt from the participation and vesting provisions of ERISA, 29 U.S.C. §§ 1051-1061, its funding provisions, 29 U.S.C. §§ 1081-1086, and its fiduciary responsibility provisions, 29 U.S.C. §§ 1101-1114, though not from its reporting and disclosure provisions, 29 U.S.C. §§ 1021-1031, or its administration and enforcement provisions, 29 U.S.C. §§ 1131-1145. *Demery v. Extebank Deferred Compensation Plan (B),* 216 F.3d 283, 286-87 (2d Cir. 2000).

10

distribution shall be made or commenced prior to the Participant's termination of employment or death, or a 'Change of Control.'" *See* Plan, Art VII.A.

The Plan also repeatedly states that it is governed by ERISA. *See* Plan, at 2, ¶ 10; Art. VI.B. The Trust Agreement also states that the Plan is an unfunded Plan that provides deferred compensation to a select group of employees for purposes of ERISA. *See* Complaint, Ex. A. The Plan also provides that "the Company shall pay all of the accrued benefits from its general assets;" *see* Plan, ¶ 4 that "the assets of the trust shall at all times be subject to the claims of general creditors of the company," and that "the existence of the Trust shall not alter the characterization of the Plan as "unfunded" for purposes of [ERISA]." *See* Plan, at l, ¶ 9, 10. Lastly, Article VI of the Plan provides that "statements to Participants are for reporting purposes only, and no allocation, valuation or statement shall vest any right or title in any part of the Trust Fund, nor require any segregation of Trust assets, except as specifically provided in this Plan."

Bishop also contends that SGI's Plan allowed Bishop to withdraw his entire deferred salary before retirement and termination of employment, and therefore it is not a covered ERISA plan. However, both the Department of Labor[7] and courts have held that an ERISA plan can include an early withdrawal option. *See Spitz v. Berlin Industries, Inc.*, 1994 U.S. Dist. Lexis 1576, *11 (N.D. Ill. 1994)(finding a Plan was subject to ERISA

---

[7] SGI attached to its Reply various Department of Labor ERISA opinion letters, finding that plans that defer compensation but allow early withdrawals are covered by ERISA. The Department of Labor is charged with administering the statute, courts defer to its interpretation of ERISA. *E.g., Yates v. Hendon*, 541 U.S. 1, 17, 20-1 (2004) (relying on Department of Labor determination).*See also Marcella v. Capital Dist. Physicians' Health Plan*, Inc., 293 F.3d 42, 49 n.1 (2d Cir 2002) ("the Department of Labor has the power to issue administrative interpretations of ERISA which carry the force of law").

11

despite the option of withdrawing employer contributions from the plan prior to either retirement or termination.); *In re Meinen,* 228 B.R. 368 (Bankr. W.D. Pa. 1998) (holding that access to an early withdrawal option does not remove a plan from ERISA's coverage); *see also Patterson v. Shumate,* 506 U.S. 753 (1992).

**State Law Claims are Pre-Empted by ERISA**

In the alternative, Bishop argues that even though the Plan is governed by ERISA, the state law claim that a constructive trust was created due to SGI's failure to disperse Bishop's compensation when requested is not pre-empted by ERISA.

ERISA includes a broad and explicit pre-emption clause covering any state law claim that "relates to" an ERISA employee benefit plan. 29 U.S.C. §1144. ERISA pre-emption has been characterized by some commentators as among the "broadest ever enacted by Congress." Paul J. Zech, *Federal Pre-Emption and State Exclusive Remedy Issues in Employment Litigation*, 72 N.D. L. REV. 325, 336 (1996). ERISA has been interpreted as intended to pre-empt even generally applicable laws enacted by a state, laws that unintentionally or indirectly affect an ERISA plan, not simply laws aimed exclusively at employee benefit plans. *See Ingersoll-Rand Co. v. McClendon,* 498 U.S. 133, 136-38, (1990); *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 47-48 (1987); *PM Group Life Ins. Co. v. Western Growers Assurance Trust*, 953 F.2d 543, 545 (9th Cir. 1992); *McLean v. Carlson Cos., Inc.*, 777 F.Supp. 1480, 1483 (D.Minn.1991)(Courts have consistently pre-empted state laws that "provide remedies for misconduct growing out of the administration of ERISA plans.") Even non-traditional ERISA plans can result

in ERISA pre-emption. *See Moeller v. Bertrang*, 801 F. Supp. 291, 298 (D.S.D. 1992). (action against former employer seeking to recover retirement benefits based solely on the employer's oral promise to his employees that such benefits would be payable deemed to be pre-empted by ERISA.)

Bishop's state law claims are subject to pre-emption under ERISA because ERISA provides an exclusive enforcement provision, which provides that a civil action may be brought to, "recover benefits due to [the participant] under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). The Supreme Court in *Aetna Health Inc. v. Davila*, 542 U.S. 200 (2004), held that a state law claim is superseded by ERISA's exclusive enforcement provision:

> [A]ny state-law cause of action that *duplicates, supplements, or supplants* the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted by ERISA . . . .

*Id*. at 209 (citations omitted). Bishop's claim arises from deferred compensation owed to him under the Plan, which is governed by ERISA. Therefore, Bishop's argument that California law created a constructive trust under California Civil Code Sections 2223-2224 is an attempt to "supplant" the civil-enforcement-remedy scheme contained in ERISA and is pre-empted by ERISA. "[B]y creating a separate allocation mechanism outside the scope of the bankruptcy system, 'the constructive trust doctrine can wreak . . . havoc with the priority system ordained by the Bankruptcy Code,' and bankruptcy courts are thus 'generally reluctant to impose constructive trusts without a substantial reason to

do so." *In re First Cent. Fin. Corp.*, 377 F.3d 209, 217 (2d Cir. 2004) (quoting *In re Haber Oil Co.*, 12 F.3d 426, 436 (5th Cir. 1994).

The contention that the state law claim is merely a procedural mechanism for the enforcement of a liability, rather than a cause of action which establishes liability, is unavailing. The Supreme Court in *Mackey v. Lanier Collection Agency & Serv.*, 486 U.S. 825 (1988), held that "ERISA does not provide for an enforcement mechanism for collecting judgments . . . . [C]onsequently, state-law methods for collecting money judgments must, as a general matter, remain undisturbed by ERISA; otherwise, there would be no way to enforce such a judgment won against an ERISA plan." *Id*. at 833-34.

However, the case at bar is distinguishable from *Mackey* because *Mackey* involved a garnishment proceeding that created "no substantive causes of action, no new bases for relief, or any grounds for recovery. . . ." *Id*. at 834. On the other hand, Bishop's argument relies on a new basis for relief, namely the recognition of a constructive trust. The distinction between the constructive trust claim and an enforcement mechanism is highlighted by the fact that under California law constructive trusts are governed by Sections 2223-2224 of the California Civil Code, whereas procedures for enforcing judgments are found in the California Code of Civil Procedure. *See e.g.*, Cal. Code of Civil Procedure §§ 695.010-709.010. A constructive trust is <u>simply</u> not the type of "enforcement mechanism" contemplated by the Supreme Court in *Mackey* and, therefore, is pre-empted by ERISA.

Moreover, the Second Circuit Court of Appeals in *RTC v. MacKenzie*, 60 F.3d 972 (2d Cir. 1995), rejected the argument that participants in a deferred compensation plan are entitled to "a superior right to . . . trust assets where [the participant's] claim to those assets was made prior to receivership." *Id*. at 976.[8] The deferred compensation plan in *MacKenzie* contained similar language as the SGI Plan. *Id*. at 977. Both plans subjected the assets of the respective plans to the general creditors of the employers so that the plans' participants could potentially obtain tax benefits. As in Bishop's case, the employees in *MacKenzie* had made requests for disbursement of the funds held in the plan on their behalf prior to the employer's receivership, in MacKenzie's case, or bankruptcy, in Bishop's case. *Id*. at 976. In both cases, those requests were denied and the assets remain with the respective third-party trustee. *Id*. If accepted, Bishop's argument would provide Bishop with "a superior right to" the Plan's assets. This is the exact same reasoning that the Second Circuit rejected in *MacKenzie*. *Id*. at 976. The Second Circuit made clear that "[r]ightly or wrongly, the Plan assets remain in the grantor trust held by [the third-party trustee], the [employer's] property, at the time of [receivership]. This fact is dispositive of [the case]." *MacKenzie*, 60 F.3d at 977. Thus, the argument that SGI's failure to disperse funds upon request created a constructive trust must be rejected. The *MacKenzie* court held that the "fact that the Plan assets remained

---

[8] MacKenzie involved the insolvency of Columbia Banking Federal Savings and Loan Association. Savings and loan institutions are explicitly excluded from the definition of "debtor" under the Bankruptcy Code. *See* 11 U.S.C. 109. When savings and loan institutions become insolvent they are "liquidated pursuant to federal banking statutes, including the Federal Deposit Insurance Act, 12 U.S.C. § 1811 et seq., and the Federal Home Loan Bank Act, 12 U.S.C. § 1421 et seq., as amended by [the 1989 Financial Recovery and Enforcement Act]." *Cortina v. Sovran Bank, N.A.*, 927 F. Supp. 439, 445 (S.D. Fla. 1994). The court in *Cortina* held that, in the context of determining a party's rights to assets held in trust as part of a deferred payment plan, a savings and loan institution entering receivership was the equivalent of filing for bankruptcy. *Id*. at 445. *See also*, *Goodman v. RTC*, 7 F.3d 1123 (4th Cir. 1993).

in the trust" at the time of receivership was by itself sufficient to show that the receiver had superior rights, over the employees, to the trust assets. *Id*. at 978.

In this case, SGI has provided the plan documents that clearly establish the Plan is covered by ERISA. Under the terms of the Plan, therefore, Bishop's rights to the funds are no greater than those of unsecured creditors. "[T]he recipients of grantor or 'rabbi' trusts are unsecured creditors, who took the risks of being subject to the claims of general creditors for the benefits of favorable tax treatment . . . ." *Goodman v. RTC*, 7 F.3d 1123, 1129 (4th Cir. 1993). *See also McKay v. Paradise*, 299 US 119, 122-23 (1936) (assets must be available to the employers' creditors even if default to the employees is "an acute disappointment" or "especially regrettable.").

**Motion to Amend the Answer**

Almost as an afterthought, Bishop seeks leave to amend his answer to add additional defenses consistent with his response to SGI's motion to strike suggesting without amplification from the Response that (i) the deferred compensation program was not an ERISA plan, and (ii) Bishop's salary should be paid under California's wage and hours law. Both of these defenses are based on the same theory discredited as a matter of law, that the Plan is not an ERISA Plan. As set forth above, this Court has determined that the Plan is an ERISA Plan, and thus not subject to state law remedies, and accordingly, the proposed amendment would be futile and thus the motion to amend is denied. *Lucente v. Int'l Bus. Machs. Corp.,* 310 F.3d 243, 258 (2d Cir.2002) (citing *Dougherty v. North Hempstead Bd. of Zoning Appeals,* 282 F.3d 83, 88 (2d Cir.2002)) (An amendment to a

pleading is futile if it could not withstand a motion to dismiss under Rule 12(b)(6)); *Credit Suisse First Boston, LLC v. Intershop Comm. AG,* 407 F.Supp.2d 541, 551 (S.D.N.Y. 2006)(denying motion to amend answer to include new affirmative defense when defense would be insufficient as a matter of law). In addition, Bishop's California wage claim is meritless because it seeks to impose a constructive trust on assets of SGI which, as noted above, is prohibited by the Second Circuit's decision in *MacKenzie*, *supra*.

**CONCLUSION**

For the reasons set forth above, the Motion to strike Bishop's affirmative defense or dismiss the counterclaim is granted; Bishops motion to amend is denied.

SUBMIT AN ORDER CONSISTENT WITH THE FOREGOING.

Dated: New York, New York
February 13, 2007

/s/ Burton R. Lifland
United States Bankruptcy Judge